MJ 26-05587

# United States District Court
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

**UNITED STATES OF AMERICA,**

v.

**TRUNG NGUYEN VAN,**
[DOB: 11/03/1988],

Defendant.

**COUNT ONE:**
***Money Laundering - Concealment***
18 U.S.C. § 1956(a)(1)(B)(i)
NMT 20 Years' Imprisonment
NMT $500,000 Fine
NMT 3 Years' Supervised Release
Class C Felony

**COUNT TWO:**
***Money Laundering - Monetary Transactions***
18 U.S.C. §§ 1957(a) and (b)(1)
NMT 10 Years' Imprisonment
NMT $250,000 Fine
NMT 3 Years' Supervised Release
Class C Felony

$100 Special Assessment per Felony Count

## CRIMINAL COMPLAINT

**Case Number: 26-MJ-00213-WBG(LMC)**

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**COUNT ONE**
***(Money Laundering – Concealment)***

On or between August 7, 2024, and August 9, 2024, in the Western District of Missouri and elsewhere, the defendant, TRUNG NGUYEN VAN, did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that is, the wire fraud scheme alleged in the attached affidavit regarding $569,569 of cryptocurrency from Victim #1, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, all contrary to the provisions of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**COUNT TWO**
***(Money Laundering – Monetary Transaction)***

On or between August 7, 2024, and August 9, 2024, in the Western District of Missouri and elsewhere, the defendant, TRUNG NGUYEN VAN, did knowingly engage or attempt to engage in a monetary transaction in criminally derived property, that is $569,569 of cryptocurrency from Victim #1, a value greater than $10,000, which property was, in fact, derived from a specified unlawful activity, that is the wire fraud scheme alleged in the attached affidavit, and the transaction took place in the United States, all contrary to the provisions of Title 18, United States Code, Sections 1957(a) and (b)(1).

I further state that I am Special Agent Savannah Baker of the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

*(See attached Affidavit)*

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No.

[signature]

Savannah Baker, Special Agent
Federal Bureau of Investigation

Presented by reliable electronic means and sworn to telephonically,

September 23, 2026 Sworn to by telephone 1:07 PM, Sep 23, 2026 at Kansas City, Missouri

Date City and State

HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Name and Title of Judicial Officer

Lajuana M. Counts
Signature of Judicial Office

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TRUNG NGUYEN VAN,<br>Defendant. | Case No. 26-MJ-00213-WBG(LMC) |

**MOTION OF THE UNITED STATES FOR CONTINUANCE OF A DETENTION HEARING**

Comes now the United States of America, by and through its undersigned counsel, and does hereby move the Court for its order granting a continuance of the detention hearing as to the above-noted defendants, provided by Section 3142(f), Title 18, United States Code.

**SUPPORTING SUGGESTIONS**

Title 18, United States Code, Section 3142(f) provides that the appropriate judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in Section 3142(c) will reasonably assure the appearance of a defendant as required and the safety of any other person and the community when the attorney for the government moves for a detention hearing provided by said subsection, or upon the appropriate judicial officer's own motion, also as provided by Section 3142(f).

Subsection (f) of Section 3142 provides: "The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the government seeks a continuance. Except for good cause, a continuance on motion of the person

may not exceed five days, and a continuance on motion of the attorney for the government may not exceed three days. During a continuance, the person shall be detained . . . ."

The United States desires the continuance to facilitate the acquisition of additional information regarding each of the above defendants, to evaluate the said information, and to prepare for the hearing.

Respectfully submitted,

R. Matthew Price
United States Attorney

By /s/Jeffrey Q. McCarther

Jeffrey Q. McCarther
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on September 23, 2026, to the CM-ECF system of the United States District Court for the Western District of Missouri, and a copy of the foregoing will be hand-delivered to the defendant at his first appearance before a judicial officer.

/s/Jeffrey Q. McCarther
Jeffrey Q. McCarther
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TRUNG NGUYEN VAN,<br><br>Defendant. | Case No. 26-00213-WBG (LMC) |

## MOTION FOR DETENTION HEARING

The United States of America, by the undersigned Assistant United States Attorney, for the Western District of Missouri, hereby requests that the Court detain Defendant Trung Nguyen Van without bail pending trial of this matter and hold a hearing, pursuant to 18 U.S.C § 3142(f)(2)(A), for the purpose of demonstrating that no condition or combination of conditions of release will reasonably assure Defendant's appearance as required by the Court and assure the safety of other persons and the community.

## SUPPORTING SUGGESTIONS FOR PRETRIAL DETENTION

1. The United States moves for detention due to this case involving a serious risk that the defendant will flee. Taken together, the serious nature of the charges in this case; the strength of the evidence against the defendant, and the length of the defendant's potential prison sentence all support the United States' motion pursuant to 18 U.S.C § 3142(f)(2)(A).

2. In determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required and reasonably assure the safety of the community, the Court, pursuant to 18 U.S.C. § 3142(g), must consider several factors. These factors include the nature and circumstances of the offenses charged, the weight of the evidence against the

defendant, the defendant's history and characteristics, and the danger to any person or the community the defendant would pose if released. After consideration of these factors, the United States requests the pretrial detention of Defendant.

3. As provided in the filed complaint and affidavit in this case, Defendant has been charged with two felony counts of money laundering as part of a broader wire fraud scheme involving over $125,000,000 worth of cryptocurrency. These charges stem from Defendant serving as a laundering hub for a series of cryptocurrency wire-fraud schemes targeting United States citizens.

4. At least $24 million of the funds traced to Defendant's account were tied to known "pig-butchering" schemes. "One of the most common categories of cryptocurrency investment fraud is known as 'pig butchering,' a highly lucrative billion-dollar industry that has victimized millions of Americans. Pig butchering scams involve fraudsters gaining the trust of victims, oftentimes via a fictitious romantic relationship, and duping them into making investments into fake cryptocurrency projects. These schemes typically begin with a victim meeting someone on an online dating website. Alternatively, a victim may receive a random unsolicited message on social media, via text, or through a messaging application, with the conversation eventually appearing to turn romantic. The victim will then be convinced to begin transferring money to an alleged cryptocurrency investment opportunity recommended by the scammer. The scammer will eventually highlight seemingly impressive monetary gains from initial investments and encourage the victim to invest increasingly larger amounts, ultimately resulting in financial ruin to the victim."[1]

---

[1] https://www.secretservice.gov/investigations/investmentfraud-pigbutchering

5. Specifically, Defendant operated a cryptocurrency wallet that served a crucial part of the flow of money for a cryptocurrency scam that targeted multiple United States victims. Defendant's cryptocurrency wallet would serve as a "pass-through" for victim funds that would eventually be repeatedly distributed and scattered amongst other cryptocurrency wallets making law enforcement tracing and attempts to freeze and seize the lost funds nearly impossible once victims would identify the scam.

6. The two charged counts relate to an individual victim, Victim #1, located in the Western District of Missouri. From June 2024 to August of 2024, Victim #1, made multiple cryptocurrency transfers, totaling approximately $16,000,000, believing he/she was making an investment in a cryptocurrency investment platform called "Triangle." One such transfer, taking place on August 7, 2024 - directly traceable to Defendant's cryptocurrency wallet - was for over $569,000 in cryptocurrency. On August 9, 2024, Defendant's cryptocurrency wallet received six transfers totaling approximately $569,569 worth of cryptocurrency, traceable to Victim #1. Immediately following the receipt of the funds, the Defendant proceeded to transfer approximately $567,999 worth of cryptocurrency in four transactions to a private, unhosted cryptocurrency wallet off of the centralized blockchain network.

7. Over the entirety of Defendant's cryptocurrency wallet history, spanning from February 9, 2018, through December 17, 2024, it received approximately $53,275,939 worth of cryptocurrency assets. The wallet transferred approximately $53,188,466 worth of cryptocurrency assets to accounts external and separate from the user between the time periods February 12, 2018, and November 4, 2024.

8. The nature and circumstances of the offenses charged show Defendant was an integral part of a long-term, lucrative fraudulent scheme to deprive United States victims of tens of

millions of dollars' worth of cryptocurrency. In fact, as of August 2026, the scheme appears to be ongoing, as many of the fraudulent web domains are still functioning and the "pass-through" cryptocurrency wallets are still actively receiving and sending funds. For these reasons, the nature and circumstances of the charged offenses support the pretrial detention of Defendant.

9. The United States has a strong case against Defendant. The above-noted funds attributable to Victim #1 are directly traceable to the cryptocurrency wallet of Defendant. The weight of the United States' evidence is specifically relevant in this case due to the potential lengthy prison sentence Defendant could face if convicted. For these reasons, the weight of the evidence against Defendant in this case supports pretrial detention.

10. Importantly, Defendant is a serious flight risk. Defendant is not a United States citizen, appears to have no connections here, and has apparently only been present in the United States since September 20, 2026, with an expectation of immediately leaving the county on September 24, 2026. Indeed, on September 22, 2026, the FBI was notified that Defendant had entered the United States by way of the pedestrian entrance at the San Ysidro, California / Mexico border entry point on September 20, 2026. Defendant was booked to fly out of Los Angeles International Airport on an international flight to Taiwan on September 24, 2026, at 12:30 a.m. Pacific Time. If released, it is highly likely that Defendant would flee the country.

## CONCLUSION

11. When considered together, the nature and circumstances of the offense charged, the weight of the evidence against Defendant, the ongoing nature of the "pig-butchering" fraud scheme, and the serious risk that Defendant will flee the United States, it is apparent that no condition or combination of conditions can reasonably assure the appearance of Defendant as

required and reasonably assure the safety of the community. As such, the United States respectfully requests the pretrial detention of Defendant Trung Nguyen Van.

Respectfully submitted,

R. Matthew Price
United States Attorney

By *‌/s/ Jeffrey Q. McCarther*

Jeffrey Q. McCarther
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on September 23, 2026, to the CM-ECF system of the United States District Court for the Western District of Missouri, and a copy of the foregoing will be hand-delivered to the defendant at his first appearance before a judicial officer.

*‌/s/ Jeffrey Q. McCarther*

Jeffrey Q. McCarther
Assistant United States Attorney

26-MJ-00213-WBG(LMC)

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Savannah Baker, a Special Agent with the Federal Bureau of Investigation being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a complaint. This affidavit contains information necessary to support a probable cause determination that **Trung Nguyen Van** has committed federal offenses, specifically engaging in laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(2) and engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S. Code § 1957.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since March of 2019. My current responsibilities primarily consist of investigating white-collar crimes, including matters involving complex financial crimes, health care fraud, and money laundering. I have investigated a wide variety of complex financial matters and have received training and experience in methods and tactics used in cryptocurrency-based wire fraud schemes. Additionally, I have attended training on the various ways criminals leverage Artificial Intelligence (AI) to carry out cyber-enabled crimes. Previously, I investigated matters related to terrorism for five years, including complex terrorism financing cases. As a Special Agent, I received my initial training at the FBI Academy in Quantico, Virginia, where I received training in investigating various federal criminal offenses, including terrorism, violent and organized crimes, interviewing and interrogating suspects, tactical operations, and firearms. Prior to my time in the FBI, I served six years in the United States Air Force as an Intelligence Analyst. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am

a law enforcement officer with authority to execute arrest, search, and seizure warrants under the authority of the United States. I have participated in a wide variety of criminal investigations, to include white-collar crimes, and other violent and non-violent Federal crimes. Additionally, I have participated in the preparation and/or execution of many search and seizure and arrest warrants. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request an arrest warrant.

3. The facts in this affidavit come from my participation in this investigation, personal observations, my training and experience, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purposes of enabling this Court to make a judicial determination of probable cause to issue a complaint charging the defendant with federal offenses, I have not included all facts known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the legal basis to support a probable cause determination for the charges contained in the accompanying complaint.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1956(a)(2), laundering of monetary instruments, and 18 U.S. Code § 1957, engaging in monetary transactions in property derived from specified unlawful activity have been committed, are being committed, and will be committed by Trung Nguyen Van and others both known and unknown to investigators.

## TARGET OFFENSES

5. 18 U.S.C. § 1956 provides the following:

(a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States-

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

6. 18 U.S.C. § 1957 provides the following:

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b) (1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both. If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this subsection is greater. (2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

(c) In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.

(d) The circumstances referred to in subsection (a) are—

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

(2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General.

## PROBABLE CAUSE

Background Regarding Virtual Currencies and Virtual Currency Exchanges

1. Virtual currencies ("cryptocurrency") are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, but rather are generated and controlled through computer software.

2. Virtual currency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and then generate, store, or generate and store public and private keys used to send and receive cryptocurrency. A public key, or public address, is akin to a bank account number, and a private key, or private address, is akin to a PIN number or password that allows a user to access and transfer value associated with the public address or key.

3. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, tether, or "USDT," is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. As of December 6, 2024, 1 USDT was worth approximately $1.0005.

4. Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

5. Ether (ETH) is cryptocurrency created by a collection of individuals and is part of the Ethereum blockchain. As of December 10, 2024, 1 ETH was worth approximately $ 3,639.30. USDT exists on multiple blockchains, including the Ethereum network.

6. Payments made with cryptocurrencies, like USDT and ETH, are recorded in a public ledger that is maintained by peer-to-peer verification (i.e., a "blockchain") and is thus not maintained by a single administrator or entity.

7. Individuals can acquire USDT, ETH and other cryptocurrencies through, for example, exchanges (i.e., websites that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies), ATMs, or directly from other people. Cryptocurrency "exchanges" are clearinghouses that allow for exchange between different types of cryptocurrencies, or between cryptocurrency and fiat currency (e.g., U.S. dollars). Some exchanges also allow users to create accounts and store cryptocurrency with the exchange, like a bank account. In those instances, the cryptocurrency is often stored in an address or series of addresses owned and controlled by the exchange operator. Cryptocurrency exchanges operate both inside and outside of the United States. Popular cryptocurrency exchanges available to U.S. residents include Coinbase, Kraken, and Gemini. Binance Holdings Ltd., branded Binance, is the world's largest cryptocurrency exchange in terms of daily trading volume of cryptocurrencies.[1]

[1] https://www.binance.com/en

8. An unhosted wallet—also known as self-hosted or non-custodial—refers to a type of digital wallet that is hosted and controlled by the user, as opposed to being hosted by any exchanges, markets, or other Virtual Asset Service Providers, (VASPs), which means that the applicant cryptocurrency balances are off any third parties, and the applicant did not pass any "know-your-customer," (KYC) or customer due diligence processes. Such wallets offer their owners direct control over their private keys and, consequently, the security and management of their digital assets.

9. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a public ledger, the true identities of the individuals or entities behind the public addresses are not recorded on the public ledger. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Tether, Bitcoin, and Ethereum-based transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.

10. Blockchain explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. The blockchain explorer uses a database to arrange and present the data to a user in a searchable format.

<u>Background on Triangular Wire Fraud Scheme</u>

11. This affidavit demonstrates that Van—using a Binance cryptocurrency address identified below as the Target Account, which served as a laundering hub for a series of cryptocurrency wire-fraud schemes targeting United States citizens. In addition to the general flow of funds and structure of the transactions in and out of Van's Binance account, at least $53 million from six known scam-associated sources and other unidentified sources, flowed

through the account. Over $1 million was specifically traced from two US-based victims through Van's account in 2024.

12. At least $24 million of the funds traced to Van's account were tied to known "pig-butchering" schemes. "One of the most common categories of cryptocurrency investment fraud is known as 'pig butchering,' a highly lucrative billion-dollar industry that has victimized millions of Americans. Pig butchering scams involve fraudsters gaining the trust of victims, oftentimes via a fictitious romantic relationship, and duping them into making investments into fake cryptocurrency projects. These schemes typically begin with a victim meeting someone on an online dating website. Alternatively, a victim may receive a random unsolicited message on social media, via text, or through a messaging application, with the conversation eventually appearing to turn romantic. The victim will then be convinced to begin transferring money to an alleged cryptocurrency investment opportunity recommended by the scammer. The scammer will eventually highlight seemingly impressive monetary gains from initial investments and encourage the victim to invest increasingly larger amounts, ultimately resulting in financial ruin to the victim."[2] The following victims identified in this investigation reported individual accounts of events consistent with the definition of a pig-butchering scheme.

***Victim #1***

13. The investigation into Van arose out of a pig-butchering scheme targeting Victim #1. On or about April 17, 2024, an unidentified LinkedIn account holder who identified themselves with a fictitious name of Bertha Wright contacted Victim #1 through his/her LinkedIn account. Wright claimed to live in Miami, Florida and work as a partner at a semiconductor

---

[2] https://www.secretservice.gov/investigations/investmentfraud-pigbutchering

company. Victim #1 communicated with Wright for a few days via LinkedIn before transitioning to WhatsApp, where Victim #1 used WhatsApp number ###-###-5551 to contact Wright's WhatsApp number ###-###-8136. The conversations turned romantic, and Wright and Victim #1 continued to engage in text message conversations and sent multiple photographs of each other over the next approximately six weeks. A records checks revealed no one associated with the identity "Bertha Wright," and the photographs of Wright sent to Victim #1 appear, based on my training and experience, to have been generated by artificial intelligence (AI).

14. On or about June 23, 2024, Wright introduced Victim #1 to a cryptocurrency application called "Triangular," also referred to as "Triangle," and "DCGTriangle." Wright explained to Victim #1 that Triangular was an extremely profitable cryptocurrency investment platform and sent Victim #1 a step-by-step guide to using the application.

15. Triangular is a fictious cryptocurrency investment platform with a web address of dcgcompanytriangle.com. In my training and experience, legitimate online investment companies will advertise their presence and services over the course of years in an effort to attract and build a customer base. In contrast, Triangular had no digital presence besides the domain itself, which was created on May 10, 2024, shortly after Wright first contacted Victim #1. In other words, Triangular could be accessed only by typing the web address directly into the address bar on a web browser but not through public search engines, like Google or Bing, or through online investing advice companies, like Motley Fool or TheStreet.com. Moreover, the owner of the

dcgcompanytriangle domain appeared to use a private registration service (i.e., a domain proxy) to hide his or her identifying information from the public WHOIS[3] database.

16. Between June 2024 and August 2024, Victim #1 used his/her Gemini and Coinbase wallets to transfer cryptocurrency to Triangular. Because Triangular is a fictitious platform, its operators can manipulate the value of the victim's account balance to show what appears to victims to be significant gains in the value of their investments. In reality, the victims' funds have not been invested but rather moved from the deposit wallet address, through various intermediary wallets and, ultimately, cashed out by the illicit actors into alternative cryptocurrencies or fiat currency.

17. Between June 28, 2024, and August 7, 2024, Victim #1 transferred approximately $16 million in ETH and Bitcoin (BTC) to two Triangular wallets. Shortly after the initial deposit on June 28, 2024, it appeared to Victim #1 that his/her investment was growing exponentially, which encouraged him/her to continue depositing cryptocurrency into Triangular. Victim #1 sold stocks, various other investments, and used an inheritance to finance his/her transfers to Triangular.

18. After being contacted by the FBI in September 2024, Victim #1 realized he/she had been defrauded. Victim #1 then attempted to withdraw funds from his/her Triangular account, but all attempts were denied. Victim #1 contacted Triangular customer support to inquire about withdrawing funds and was told he could not withdraw funds until he repaid a loan that he took against his earned interest to open a second Triangular account. According to the terms of the loan, Victim #1's funds would be confiscated if the loan was not repaid within a certain period of time.

[3] WHOIS is an Internet protocol that is used to query databases to obtain information about the registration of a domain name (or IP address). *See* https://www.icann.org/resources/pages/what-2013-03-22-en.

Tracing Victim #1 funds through the Target Account

19. Victim #1 showed Agents how he/she accessed Triangular on his/her mobile device by logging into Coinbase[4] and accessing Triangular from within the Coinbase application. Within Triangular, Victim #1 transferred cryptocurrency to an unhosted wallet address provided within the Triangular application between June and August 2024. During all transactions from Victim #1, Victim #1 was located in Kansas City, Missouri, located in the Western District of Missouri. A blockchain analysis revealed Victim #1 deposited most of the lost funds to "Triangular" through a Gemini[5] account ($10.4 million) and a Coinbase account ($2.82 million). After Victim #1 transferred funds out of their Coinbase and Gemini accounts, the funds were rapidly split up and disbursed by the criminal actor(s) across a series of additional wallets. $569,569 of Victim #1's funds that traveled through several intermediate wallets before being deposited via six transfers into a central node Binance wallet, 0x8e670d1d6993413ce7b23fceb4e26101d2b816e0, hereafter referred to as "Target Account."

[4] Coinbase is a United States-based cryptocurrency exchange company, headquartered at 248 3rd St, #434, Oakland, CA.

[5] Gemini is a United States-based cryptocurrency exchange company headquartered 315 Park Ave. S., 18th Floor, New York, NY.

20. The $569,569 was received, consolidated, and rapidly transferred out of the Target Account. On August 9, 2024, between 06:52 and 07:25 UTC, the Target Account received six transfers totaling approximately $569,569 worth of USDT, traceable to Victim #1.



21. Immediately following, between 07:08 and 07:47 UTC, the Target Account proceeded to transfer approximately $567,999 worth of USDT in four transactions to a private, unhosted wallet address TZD5aS5EgvT92GmUmNrN8mvfXwkPUg2vpU (2vpU). Prior to making the transfers to 2vpU, the Target Account bridged the USDT from the Ethereum network to an unhosted wallet on the TRON[6] network.[7] The rapid transfers into and out of the Target Account are indicative of money laundering.

22. On August 9, 2024, between 07:08 and 07:47 UTC, the Target Account was accessed from an ios (Apple) mobile device from Ho Chi Minh City, Vietnam.

---

[6] TRON is a decentralized blockchain network. *https://www.investopedia.com/tech/what-tron-trx/*

[7] To move cryptocurrency from one blockchain network to another, a user must use a specific tool or platform to convert, or "bridge," the currency so it may be recognized by the new blockchain network. In my training and experience, converting cryptocurrencies between blockchain networks aids in money laundering because it adds an additional layer of obfuscation and makes traceability more difficult.

*Victim #2*

23. Victim #2 stated he/she was targeted in a cryptocurrency pig-butchering scam after he/she was contacted by an individual who identified themselves as "Andy John" on an online dating application in or about 2023. Victim #2 began to communicate with John via WhatsApp, and was subsequently guided by John to "invest" cryptocurrency in a fictitious investment platform, 'web-contractmarket.com.' Victim # 2 realized he/she had been scammed after he/she could not withdraw any funds in or about 2025. Additionally, Victim #2 received threatening messages in an attempt to extort additional payments from Victim #2. Victim #2 performed a reverse image search of John, which revealed photos tied to numerous dating sites.

<u>Tracing of Victim #2's funds into the Target Account</u>

24. On August 1, 2024, Victim #2, a transferred $450,000 to an unhosted wallet address, which subsequently traveled through multiple wallets and was comingled with funds from other unidentified individuals before being transferred into the Target Account. Van subsequently transferred Victim #2's funds to 2vpU. The following graph represents the initial transfer of Victim #2's funds and its deposit into Van's wallet, indicated by an orange icon.

25. On August 1, 2024, an ios mobile device accessed the Target Account from Ho Chi Minh City, Vietnam between 05:32 and 14:11 UTC.



Use of Target Account to launder money from other fraud schemes

26. Based on the above information, investigators conducted additional tracing related to transfers made from the Target Account and 2vpU.

27. Over the entirety of the Target Account's history, spanning from February 9, 2018, through December 17, 2024, it received approximately $53,275,939 worth of cryptocurrency assets. The Target Account transferred approximately $53,188,466 worth of cryptocurrency assets to accounts external and separate from the user between the time periods February 12, 2018, and November 4, 2024.

28. Between July 13, 2024, and August 25, 2026, 2vpU received $125,975,330 and sent $125,975,003. Approximately $24,365,313 of those funds were received as a transfer from the Target Account. $24,365,313 of the funds the Target Account sent to 2vpU were traced to known scams, based on data derived from a third-party, government-contracted data aggregation provider.

29. In addition to Victim #1 and Victim #2, five US-based victims reported a combined loss of over $5 million to different pig butchering schemes which are attributed to several of the aforementioned suspicious wallets that sent funds to the Target Account. Each of the five victims were instructed to transfer cryptocurrency to different websites, but each victim reported a similar story. In each of these schemes, victims were guided by an individual they met online to invest cryptocurrency in a specified "website" with a promise of high financial returns. Ultimately, each victim was never able to withdraw funds they invested and eventually discovered they had been defrauded.

FBI Investigation and Seizure

30. To date, none of the victims identified in this investigation have recovered any of the funds as a part of this scheme. Furthermore, financial tracing revealed the funds were never available for withdrawal by the Victims at any point, as had been promised.

31. As a part of the Government's investigation into the Triangular fraud scheme, the Government identified and seized $325,000 in cryptocurrency from wallets involved in laundering victims' lost funds. In response to the seizure, the United States Attorney's Office for the Western District of Missouri received eight petitions from victims who claimed a combined loss of over $36 million to the Triangular fraud scheme.

32. Additionally, the Department of Justice secured a Preliminary Injunction against two domains associated with Triangular. According to multiple victim interviews, scammers subsequently directed them to new domains after the original domain stopped working. Two of the domains that victims were redirected to were trigarbitrage.eth.limo and trig-arb.eth.link. Investigators found that these domains could not be disabled by the host, and therefore have continued to exist. As of August 26, 2026, trigarbitrage.eth.limo and trig-arb.eth.link were still active and displayed the following splash pages directing visitors to connect their wallet, indicating the scheme was ongoing:







<u>Blockchain Analysis Graphic</u>

33. Over the life of Van's Binance account, over $53 million was transferred in and subsequently out of the account. Out of that $53 million, approximately $24 million was transferred from known scam-associated wallets through Van's Binance account to 2vpU. Of note, the graphic highlights numerous large transfers Van subsequently made to 2vpU. The graphic below also highlights how seemingly distinct scams directed and comingled victim funds through several common wallets before being sent to one common unhosted, unidentified wallet and then to Van's Binance account.

34. The below graphic contains red icons that are tagged as "scam," and reflect a total flow from the scam nodes of approximately $24 million. Despite being seemingly distinct scams, the Target Account acted as a common node in receiving and laundering funds from each of the

nefarious wallets. The graphic depicts the outflow of the Target Account to 2vpU between July 2024 and December 2024 which totaled approximately $24 million. The dark blue icons shows the volume of traffic once Van converted the funds to the TRON blockchain.




35. As of August 2026, 2vpU was still actively receiving and sending funds, indicating the broader scheme was ongoing.

<u>Indicia of Money Laundering</u>

36. In my training and experience, a common tactic used by fraudsters in pig butchering schemes is to claim a user's account is "frozen" and that they must pay more money to be able to eventually withdraw their funds and earnings. However, the funds and earnings represented to victims has already been laundered through a complex series of wallets as previously described and will never be retrievable by the victim. Eventually, victims find that they are never able to retrieve any of the money they "invested." By this point in the scheme, enough time has passed that their funds have been laundered through a process that makes law enforcement tracing and attempts to freeze and seize the lost funds nearly impossible. Blockchain analysis of many of the

addresses transacting with Target Account show similar patterns of rapid, large-scale movement of cryptocurrency.

37. On December 12, 2024, Binance placed a "compliance asset level freeze" on Target Account. Another freeze was placed on Target Account on October 22, 2025. The last withdrawal from Target Account occurred on November 4, 2024. Target Account has a remaining balance of approximately $125,357 worth of USDT. Van added personal payment and withdrawal methods to Target Account in February 2023. No personal withdrawals were made between 2018 and 2023 as no account was linked. Between February 2023 and 2024. $3,976 worth of USDT was deposited into the account and $5,648 worth of USDT was withdrawn from the account. The volume of transfers (approximately $53 million) without significant withdrawal activity indicates the accounts primary purpose was the facilitation of transfers from and to external accounts, and not for a business or investment purpose.

38. The rapid movement of cryptocurrency through the Target Account has no clear business purpose and is, in my training and experience, indicative of an effort to conceal and disguise the origin and illicit nature of the funds. In my training and experience, I know that it is common practice for money launderers involved in pig butchering schemes to hop blockchains in an effort to obfuscate the movement of funds. In many pig butchering schemes, cryptocurrency is converted to USDT and consolidated or laundered between blockchain networks for the purpose of obfuscation. In many pig butchering schemes, victim's money is split up and sent to various wallets where it is comingled with other victim funds and then split up into subsequent wallets. This pattern is duplicated many times to prevent traceability of victim funds. Additionally, the complex network of unhosted and hosted wallets through which funds are disbursed and rapidly adds additional layers to prevent traceability of victim funds.

39. As previously stated, none of the victims identified in this investigation recovered any funds that they "invested" as a part of the scheme. The evidence gathered thus far establishes probable cause to believe that the Target Account is being used to conceal and launder illicit funds; specifically, criminal proceeds from an international cryptocurrency scam in which subjects fraudulently induced victims to buy and transfer cryptocurrency through illegitimate investment businesses.

<u>Identification of Target Account Owner</u>

40. Information voluntarily provided by Binance revealed the owner of Target Account to be Trung Nguyen Van hereinafter referred to as "Van." Van provided the following identifying information to Binance:




Name: Trung Nguyen Van

Date of Birth: November 3, 1988

Email address: hayhoc123@gmail.com

Phone number: +840936596101

Trung Nguyen Van's Travel to the United States

41. On September 22, 2026, the FBI was notified that Van had entered the United States by way of the pedestrian entrance at the San Ysidro, California border entry point on September 20, 2026. Van is booked to fly out of Los Angeles International Airport on an international flight to Taiwan on September 24, 2026, at 12:30am Pacific Time. Van's short time in the United States presents a limited window to apprehend Van for violations of federal law, and to disrupt a network which is actively laundering hundreds of millions of dollars in cryptocurrency.

42. Based on these facts, I submit there is probable cause that Van committed violations of 18 U.S.C. § 1956(a)(2), laundering of monetary instruments, and 18 U.S. Code § 1957, engaging in monetary transactions in property derived from specified unlawful activity in furtherance of an international pig butchering fraud scheme.

**REQUEST FOR SEALING**

43. It is respectfully requested that this Court issue an arrest warrant under seal, to include all papers submitted in support of the Complaint, until further order of the Court or the initial appearance Van. I believe that sealing these documents is necessary for the safety of the arresting law enforcement officials. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits via the Internet and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize the safety of law enforcement officials.

**CONCLUSION**

44. I submit that this affidavit supports a probable cause determination that Van has committed federal offenses, specifically engaging in money laundering transactions in violation of 18 U.S.C. § 1956(a)(2), laundering of monetary instruments, and 18 U.S. Code § 1957, engaging in monetary transactions in property derived from specified unlawful activity.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Savannah S. Baker
Special Agent
Federal Bureau of Investigation

Presented by reliable electronic means and sworn to telephonically on this 23rd day of September 2026. Sworn to by telephone 1:07 PM, Sep 23, 2026

HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri